[Cite as *State v. Johnson*, 2017-Ohio-5708.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 15 JE 0020 |
| VS. | ) | |
| | ) | OPINION |
| LAMAR D. JOHNSON | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from the Court of
Common Pleas, Jefferson County, Ohio
Case No. 15 CR 9

JUDGMENT:     Reversed and Remanded.


APPEARANCES:
For Plaintiff-Appellee     Attorney Jane Hanlin
Jefferson County Prosecutor
Attorney Michael Calabria
Assistant Prosecutor
16001 State Route 7
Steubenville, Ohio 43952


For Defendant-Appellant     Attorney Bernard Battistel
2021 Sunset Boulevard
Steubenville, Ohio 43952


JUDGES:

Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Carol Ann Robb


Dated: June 30, 2017

DeGENARO, J.

{¶1}    Defendant-Appellant Lamar Johnson appeals the trial court's judgment convicting him of possession of drugs.  Johnson asserts insufficiency and manifest weight of the evidence, ineffective assistance of counsel and that the trial court erred by denying his motion to suppress.  Because the trial court should have granted the motion to suppress, the judgment of the trial court is reversed and the case remanded for further proceedings.

{¶2}    Johnson was indicted on two felony counts which were bifurcated for trial; the charge at issue in this appeal is possession of drugs, R.C. 2925.11(A) and (C)(6)(d), a second degree felony. Johnson filed a motion to suppress the heroin found in a closed book bag the day of his arrest which was denied.  Johnson was convicted and sentenced to eight years.

{¶3}    Officers from the Toronto Police Department and the Jefferson County Sherriff's Office travelled to the trailer of Lori Neal to execute an arrest warrant for her son, Josh Gilchrest.  The officers also brought an outstanding felony warrant for Johnson because he was known to associate with Gilchrest.

{¶4}    Before two officers knocked on the front door and identified themselves, a third officer went to the rear of the trailer, while a fourth officer went to a window to observe the interior. Gilchrest was observed emerging from the bathroom and walking to the front of the trailer; then, after the knock and announce, pivoting and moving to the back of the trailer.  After being alerted to movement in the trailer, officers entered the unlocked front door and ordered the inhabitants to lie down on the floor.  Officers found Johnson and Gilchrest's then girlfriend, Kasey Kraft lying on the bedroom floor. Officers served the warrants and handcuffed Gilchrest and Johnson. Before escorting them to the cruisers, officers asked them if there was any contraband in the trailer.  Gilchrest denied the presence of contraband while Johnson remained silent. Johnson and Gilchrest were then placed in separate vehicles.

{¶5}    Pertinent to this appeal is the following testimony from the hearing on Johnson's motion to suppress.  Toronto Detective Derrick Piatt testified that he found Johnson in the bedroom on the floor, handcuffed him and then took him into the living

room.  Piatt Mirandized Johnson and took him out to the cruiser with another officer who was escorting Gilchrest.  While Piatt was doing so, Neal, who was in an agitated state, said to Toronto Sergeant Anthony Porreca that he could search the trailer.  After securing Johnson in the cruiser Piatt had Neal execute a consent to search form.  When Piatt returned to the bedroom he observed that Porreca had an unopened black book bag on the bed.  Piatt further testified that Johnson was known to carry a black book bag, and that he had previously arrested Johnson with a black book bag.  Notably, Piatt testified that there was no concern for officer safety or the destruction of evidence, there was no emergency, and that the bag could have been taken and secured in the evidence locker while the officers obtained a search warrant.

{¶6}    Jefferson Deputy Pfouts testified next, stating that after officers entered the trailer, they ordered those present in the living room to the floor and checked for weapons; none were found.

{¶7}    Porreca testified that he saw the book bag in the corner of the closet, which did not have a door.  Officers knew the bag was in Johnson's possession that day, and Porreca stated that he had previously seen Johnson with a black book bag as well as Johnson having a black book bag when he had previously arrested Johnson.  Porreca further testified that when he opened the bag, Johnson was in the cruiser and there was no concern for officer safety, destruction of evidence, or an emergency.

{¶8}    Kraft testified at the hearing on the motion to suppress, but that testimony was completely different than at trial regarding the search of the book bag.  But for purposes of this appeal we can only consider her testimony from the suppression hearing.   Kraft stated that Porreca told her that the police had received an anonymous tip that heroin could be found in Johnson's book bag, and that Porreca specifically asked her to locate Johnson's book bag for him.  She further testified that no search of the trailer was undertaken because the sole item of interest was the book bag.  She claimed that Neal was coerced into signing the consent form.

**{¶9}** Neal testified that she suffered a panic attack when she learned that her son was being arrested for trafficking in drugs and had no recollection of signing the consent to search form. According to Officer Porreca, she began to hyperventilate after the drugs were found. EMS was called but Neal declined treatment. Neal also asserted that the trailer had not been searched because when she returned to the trailer the following morning nothing had been disturbed.

**{¶10}** Gilchrest testified that Porreca brought the book bag out to the patrol car where Johnson was seated and taunted him with it. When asked on cross examination why he showed Johnson the bag, Porreca stated that he was asking if the bag belonged to Johnson.

## Suppression - Validity of Third-party Consent

**{¶11}** Because it is dispositive of this appeal, we will consider out of order Johnson's third assignment of error in which he argues:

> The trial court erred in overruling Defendant-Appellant's motion to suppress because a valid third-party consent was not given.

**{¶12}** The appellate standard of review with respect to a motion to suppress is limited to determining whether the trial court's findings are supported by competent, credible evidence. *State v. Lloyd* (1998), 126 Ohio App.3d 95, 100, 709 N.E.2d 913; *State v. Winand* (1996), 116 Ohio App.3d 286, 288, 688 N.E.2d 9, citing *Tallmadge v. McCoy* (1994), 96 Ohio App.3d 604, 608, 645 N.E.2d 802. This deferential review is because "the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer* (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quoting *State v. Venham* (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. Thus, an appellate court must accept the trial court's factual findings and the trial court's assessment of witness credibility. *State v. Brown* (Sept. 7, 1999), 7th Dist. No. 96-B-22, citing *State v. Anderson* (1995), 100 Ohio App.3d 688, 691, 654 N.E.2d 1034. However, the appellate court must independently determine as a matter of law whether the trial court met the

applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 41, 619 N.E.2d 1141 (1993), overruled on other grounds as stated in *Village of McComb v. Andrews*, 3d Dist. No. 5-99-41 (Mar. 22, 2000).

{¶13} The trial court denied the motion to suppress. Pertinent to the issues raised in this appeal, the trial court found that the book bag, though closed, was unlocked and located in a part of the home where anyone had easy access, and for which Johnson, a guest in the trailer, had no expectation of privacy. The trial court also relied upon Johnson's proximity to the bag while he was lying on the bedroom floor to conclude that the search of the bag was made incident to a lawful arrest.

{¶14} The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and generally requires a warrant to effect a search. Thus, "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable." *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. However, warrantless searches are not per se illegal, and will be upheld when under the facts and circumstances of the particular case, it was reasonable for law enforcement to forgo securing a warrant prior to conducting a search or seizure.

{¶15} Reasonableness is demonstrated when the "societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Arkansas v. Sanders* (1979), 442 U.S. 753, 759, 99 S.Ct. 2586, 61 L.Ed.2d 235. Normal inconvenience and slight delay involved in procuring a warrant, standing alone, "are not enough to bypass the constitutional requirement." *Johnson v. United States* (1948), 333 U.S. 10, 15, 68 S.Ct. 367, 92 L.Ed. 436. Because the warrant requirement functions to set limits on police discretion, warrantless searches are unconstitutional absent a recognized exception, "notwithstanding facts unquestionably showing probable cause" sufficient to obtain a warrant. *Agnello v. United States* (1925), 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145.

{¶16} As a result, whenever feasible, government officials must procure a

warrant predicated on probable cause before conducting searches and seizures. See, e.g., *Terry v. Ohio* (1968), 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905. However, the United States Supreme Court has upheld many searches that have been conducted without the prior procurement of a warrant.

{¶17} The narrowly defined exceptions to the warrant requirement relevant to this case include searches incident to a lawful arrest, *Chimel v. California* (1969), 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, and searches where consent has been given. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. One waives their Fourth Amendment rights by consenting to a warrantless search. *State v. Barnes* (1986), 25 Ohio St.3d 203, 208, 495 N.E.2d 922.

{¶18} Johnson concedes that as Neal is the owner of the trailer and voluntarily consented to the search, he has no standing to contest the search of the trailer as he was merely a guest. However, Johnson did not consent to search his bag and argues Neal had neither common nor apparent authority over it; therefore, Neal could not consent to its search. Thus, the issue before us is the validity of the consent of a third party, Neal, to search Johnson's bag.

{¶19} Common authority is not to be implied "from the mere property interest a third party has in the property, ... but rests on mutual use of the property by persons generally having joint access or control for most purposes...." *Matlock* at 171 n. 7, 94 S.Ct. 988. "The burden of establishing that common authority rests upon the State." *Illinois v. Rodriguez* (1990), 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148. Even if a third party does not possess actual common authority over the area that was searched, as Johnson argues, the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search. *Id.* at 188–89. Apparent authority is judged by an objective standard. *Id.* A search consented to by a third party without actual authority over the premises is nonetheless valid if the officer reasonably could conclude from the facts available that the third party had authority to consent to the search. *Id.*

{¶20} The effect of consent by the owner of a dwelling to search a closed

container within the dwelling for which she has no actual authority is a matter of first impression in this district. There is a dearth of Ohio law on the subject, but the issue has been considered by the federal courts.

**{¶21}** It is well established that an individual has a heightened expectation of privacy in the contents of a closed container. *See*, e.g., *United States v. Chadwick*, 433 U.S. 1, 13 (1977). Luggage, handbags, paper bags, and other containers are common repositories for one's papers and effects, and the protection of these items from state intrusion lies at the heart of the Fourth Amendment. U.S. Const., Amdt. 4 ("The right of the people to be secure in their . . . papers, and effects, against unreasonable searches and seizures, shall not be violated"). By placing his possessions inside a container, an individual manifests an intent that his possessions be "preserve[d] as private," *United States v. Katz*, 389 U.S. 347, 351 (1967), and thus kept "free from public examination." *Chadwick*, at 11. If an object is in a closed container, the object "is not in plain view and the container may not be opened unless the packing gives away the contents." *Katz* Ohio Arrest, Search and Seizure (1997 Ed.) 214, Section 13.01 at 221, citing *United States v. Williams*, 41 F.3d 192 (4th Cir. 1994), certiorari denied (1995), 514 U.S. 1056, 115 S.Ct. 1442, 131 L.Ed.2d 321. The court in *Williams* elaborated:

> [A]lthough the plain view doctrine may support the warrantless seizure of a container believed to contain contraband, *any subsequent search of its concealed contents must either be accompanied by a search warrant or justified by one of the exceptions* to the warrant requirement. *See Jacobsen,* 466 U.S. at 114, 104 S.Ct. at 1657 ("[e]ven when government agents may lawfully seize ... a package to protect loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant *before examining the contents* of such a package") (footnote omitted); *Texas v. Brown,* 460 U.S. 730 at 749–51, 103 S.Ct. 1535 at 1547–48, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring) (plain view doctrine supports the warrantless seizure of a

closed container *but not the warrantless search of its contents that were not visible to the police*); *United States v. Corral,* 970 F.2d 719, 725 (10th Cir.1992) ("In cases involving closed containers ... the plain view doctrine may support the warrantless seizure of a container believed to contain contraband but any subsequent search of the concealed contents of the container must be accompanied by a warrant or justified by one of the exceptions to the warrant requirement."). Courts have drawn a distinction between the plain view seizure of a container and the subsequent search of that container, because its seizure under the plain view doctrine "does not compromise the interest in preserving the privacy of its contents," while its search does. *Horton,* 496 U.S. at 141 n. 11, 110 S.Ct. at 2310 n. 11; *see United States v. Donnes,* 947 F.2d 1430, 1436–37 (10th Cir.1991).

*Williams*, at 197 (emphasis added).

{¶22} Johnson argues that the facts here are analogous to the facts in *United States v. Salinas-Cano*, 959 F2d 861 (10th Cir. 1992). The State, on the other hand, likens them to the facts in *United States v. Wilburn*, 473 F.3d 742 (7th Cir. 2007). However, neither case offers much guidance. In both cases, the defendant was living with some regularity at the residence that was searched and the officers indicated to the co-occupant that they were only looking for the defendants' possessions. Yet the panels, in similar fact patterns, reached opposite resolutions to the question of whether the co-occupant had apparent authority to permit the search of a closed container. In *Salinas-Cano*, the Tenth Circuit held the warrantless search of the container was unlawful because the police were told it was the defendant's exclusive property; thus, the co-occupant had no apparent authority. Yet in *Wilburn,* the Seventh Circuit held that the co-occupant had apparent authority to consent and therefore the warrantless search was lawful, even though the police told the co-occupant they were searching for weapons in places where the defendant kept his belongings. If anything, at best these cases demonstrate how fact driven the

resolution of each case is.

**{¶23}** The split in the Circuits on this issue is apparent. For instance, in *United States v. Peyton*, 745 F.3d 546, 554 (D.C. Cir. 2014), the D.C. Circuit held that apparent authority does not exist where it is uncertain that the closed container, in that case, a shoe box, is subject to mutual use. The Seventh Circuit, on the other hand, concluded the risk of uncertainty regarding a closed container should be borne by the defendant, not the police. Thus, a person with common authority over the premises is presumed to have authority over closed containers found there, unless the police receive positive information to the contrary. *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir.2000). Similarly, the Second Circuit has held that a lessee has authority to consent to the search of all closed containers within an apartment except those that obviously belong to someone else. *United States v. Snype*, 441 F.3d 119, 136 (2d Cir.2006).

**{¶24}** We are persuaded by the rationales in *Williams* and *Peyton*. Porreca and Piatt were aware that, at a minimum, the black book bag might belong to Johnson, given their testimony that they had arrested him with a black book bag in the past. The officers' familiarity with the bag belies the trial court's conclusion that Neal had either common or apparent authority over the bag. Moreover, Neal's request to Porreca to remove any contraband in the house cannot create common authority over the bag where none existed prior to her request.

**{¶25}** Porreca and Piatt further conceded that there was no concern for officer safety, destruction of evidence, or an emergency; with Piatt testifying the bag could have been secured in order to obtain a search warrant. Therefore, Neal's consent, like the plain view exception in *Williams,* was sufficient to support the warrantless *seizure of the bag*, but insufficient to support the warrantless *search of its contents*. Johnson's Fourth Amendment privacy interest was violated because the search of a closed container must be accompanied by a warrant or justified by one of the exceptions to the warrant requirement and here it was not.

**{¶26}** Finally, the trial court determined that the search of the book bag was a

valid search incident to Johnson's arrest. Porreca testified that the black book bag was in the corner of the closet, and that Johnson's feet were close to the closet when he was lying on the bedroom floor prior to his arrest but he had been immediately handcuffed. Pfouts testified officers had already completed a safety check for weapons and found none before the bag had been discovered and opened. Finally, Johnson was handcuffed and sitting in a patrol car when the warrantless search of the bag was conducted.

{¶27} The search incident to arrest exception to the warrant requirement "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). Thus, an officer making a lawful arrest may conduct a warrantless search of the arrestee's person and of the area within his immediate control. *Chimel*, at 763, which includes "the area from within which he might gain possession of a weapon or destructible evidence." *Id.*

{¶28} The law in Ohio had long been that "the right to search incident to arrest exists even if the item is no longer accessible to the arrestee at the time of the search. * * * As long as the arrestee has the item within his immediate control near the time of the arrest, the item can be searched." *State v. Adams*, 144 Ohio St.3d 429, 45 N.E.3d 127, 2015-Ohio-3954, ¶ 183, citing *United States v. Romero*, 452 F.3d 610, 619 (6th Cir.2006) and *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir.2001)(applying 1985 law, specifically *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which permitted the warrantless vehicle search after the occupants had all been removed); see also, *State v. Sharpe*, 7th Dist. No. 99 CA 510, 2000 WL 875342, *5 (June 30, 2000) (search of arrestee's backpack that he was wearing on his shoulder at the time of his arrest was a lawful search incident to arrest even though the arresting officer searched the backpack after it had been removed from arrestee's possession and while the arrestee was in the cruiser).

{¶29} In light of criticism of some courts' broad application of *Belton*, the Supreme Court revisited the issue of automobile searches incident to arrest in *Gant*,

specifically addressing situations where the search is conducted after the scene is secured.  In a departure from long-established precedent, *Gant* significantly narrowed the parameters of searches conducted incident to arrests; police may search a vehicle incident to arrest only where the suspect is within reaching distance of the vehicle, or there is reason to believe evidence of the arresting offense will be present in the vehicle. *Id.* at 491.   *Gant* specifically limited the second prong of the test to vehicle searches. Concluding that the motion to suppress should have been granted, the Supreme Court reasoned that because Gant had been arrested, handcuffed, and detained in a patrol car, he had no possible ability to regain access to his vehicle. *Id.* The *Gant* Court wrote:

> In *Chimel*, we held that a search incident to arrest may only include 'the arrestee's person and the area "within his immediate control" – construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' *Ibid.* That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy. * * *. If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply. * * *

*Id.*

{¶30}  The relevant question is whether *Gant* is applicable to premises searches.  Courts that have extended *Gant* to apply outside the vehicular context, such as the Third Circuit in *United States v. Shakir*, 616 F.3d 315 (3d Cir.2010), because *Gant* expressed a "desire to keep the rule of *Belton* tethered to the justifications underlying the *Chimel* exception, and *Chimel* did not involve a car

search." *Shakir*, 616 F.3d at 318 (internal quotations and citations omitted). Additionally, "many courts of appeals perceived *Belton* to establish a relaxed rule for searches incident to arrest in all contexts." *Id.* "Because *Gant* foreclosed such a relaxed reading of *Belton*, the Third Circuit concluded that there is no plausible reason why it should be held to do so only with respect to automobile searches, rather than in any situation where the item searched is removed from the suspect's control between the time of the arrest and the time of the search." *Id.* The *Shakir* Court understood *Gant* to stand for the proposition that [the] police cannot search a location or item when there is no reasonable possibility that the suspect might access it." *Shakir*, 616 F.3d at 320. However, the *Shakir* Court did not read *Gant* to "prohibit a search incident to arrest whenever an arrestee is handcuffed." *Id.* at 321. Rather, the focus should be on whether a reasonable possibility exists for the arrestee to access the location. *Id.* at 320.

**{¶31}** Applying *Gant* to the facts in this case, the search cannot be countenanced as a search incident to arrest. Johnson was not only handcuffed but sitting in a patrol car; it was impossible for him to access the book bag in the bedroom of the trailer. Importantly, Piatt and Porreca testified that before the bag was opened, there was no concern for officer safety, evidence destruction, or an emergency, with Piatt testifying that the bag could have been secured and a warrant obtained before it was searched. Thus, the warrantless search of the black book bag was constitutionally invalid as it cannot constitute a valid search incident to arrest.

**{¶32}** Accordingly, for these reasons the trial court erred by denying Johnson's motion to suppress, and his third assignment of error is meritorious.

**{¶33}** Johnson asserts in his first, second and fourth assignments of error respectively:

The Defendant-Appellant's conviction was against the manifest weight of the evidence.

The State presented insufficient evidence to support a conviction for possession of drugs.

The failure of defense counsel to subpoena witnesses resulted in prejudicial error and ineffective assistance of counse.

**{¶34}** Our resolution of Johnson's challenge to the trial court's suppression ruling renders these assignments of error moot. As such, we will not address them. App.R. 12(A)(1)(c).

**{¶35}** In sum, the trial court erred by denying Johnson's motion to suppress. This ruling renders resolution of his remaining assignments of error moot. Accordingly, the judgment entry of the trial court is reversed and the case remanded to the trial court for further proceedings.

Waite, J., concurs.

Robb, P. J., dissents; see dissenting opinion.

Robb, J., dissenting opinion.

**{¶36}** I respectfully dissent from the decision reached by my colleagues and would affirm the trial court's suppression ruling.

**{¶37}** This case involves a warrantless search of a closed container, and a closed black bookbag. Generally searches require a warrant, however, there are exceptions to the rule. Majority Opinion ¶ 14-16. The two exceptions relevant to this case are search incident to arrest and consent. Majority Opinion ¶ 17. On the basis of the United States Supreme Court decision in *Gant*, I agree with my colleagues that the search of the black bookbag did not constitute a search incident to an arrest. *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710 (2009). *See also State v. Justice*, 5th Dist. No. 10 CA 41, 2011-Ohio-4004 ("Upon review, we find that the duffel bag in question was no longer in the area within Appellant's immediate control, such search was not necessary to ensure the safety of the police officers. Appellant was already in custody, in another room. The bag was closed and it was not immediately apparent to the officer that the bag contained drug paraphernalia. We therefore find that it was therefore unlawful for the police to search and seize the bag and its contents.").

**{¶38}** I, however, disagree with their analysis and resolution on whether the homeowner had apparent authority to consent to the search of the black bookbag. The majority aptly explains there is a split in the Federal Circuit Courts on the test to use to determine whether there is apparent authority over a closed container. Under one view, apparent authority does not exist where it is uncertain that the closed container is subject to mutual use. Majority Opinion ¶ 21-23 citing *United States v. Peyton*, 745 F.3d 546, 554 (D.C. Cir.2014) and *United States v. Williams*, 41 F.3d 192 (4th Cir.1994). Under the other view, a person with common authority over the premises is presumed to have authority over closed containers found, unless the police receive positive information to the contrary. Majority Opinion ¶ 23, citing *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir.2000) and *United States v.*

*Snype*, 441 F.3d 119, 136 (2d Cir.2006).

**{¶39}** The majority is persuaded by the rationale in *Williams* and *Peyton*. Majority Opinion ¶ 24. I am not; I am persuaded by *Melgar* and *Snype*. In this case, Lori Neal, the homeowner, gave her consent for the residence to be searched. The evidence presented at the suppression hearing indicated Lori Neal had apparent authority over the bookbag; the police did not receive positive information the bookbag was not Lori Neal's.

**{¶40}** During the suppression hearing both Detective Piatt and Sergeant Porreca testified when they previously arrested Appellant he had a bookbag. Tr. 22, 48. However, both officers testified they did not know this black bookbag was Appellant's until it was opened:

Q. Let me ask you this. When you and Officer Porreca laid eyes on that bag were you both – was there any doubt in your mind it was Lamar Johnson's?

A. [Detective Piatt] At first I had no idea because, I mean, we know there's several black bags but once –

Q. Right.

A. – it was opened and we seen the tablet, I-Pad, whatever you want to call it and the pay stub we knew but once – at the original bag we did not know.

* * *

Q. Okay. Do you know – this bookbag, are you familiar with this bookbag?

A. [Sergeant Porreca] How do you mean?

Q. Well, had you seen it before?

A. I'm not sure, possibly.

* * *

Q. Okay. And when you saw that bag did you recognize it?

A. [Sergeant Porreca] Not particularly.

* * *

Q. How confident were you when you saw that bag that it was Lamar's [Appellant's]?

A. [Sergeant Porreca] I really didn't know whose bag it was until I opened it up.

* * *

Q. Let me ask you this. Is it not true that when you saw that bag you knew that was Lamar's bag?

A. [Sergeant Porreca] I had no way of knowing whose bag it was until I opened it.

Q. Well, you had run into him with that bag before; haven't you?

A. I run into a lot of people with bags. I can't say whose – what bag Lamar Johnson had a year or two years before that. I can't answer – I can't say that I knew that.

Q. Well, you – didn't you indicate to me before that you arrested him with that bag?

A. I have arrested him with a bookbag. Still today I can't tell you it was the same bag.

{¶41} Admittedly, Sergeant Porreca did know Appellant handled the bag right before the officers came inside the residence. After Appellant and Josh Gilchrist were taken out of the residence, Lori Neal and Kasey Kraft, Gilchrist's girlfriend, were sitting on the couch. Sergeant Porreca testified Lori Neal told Kasey Kraft to tell the officers if there was anything in the residence. Kasey Kraft told Sergeant Porreca that when the officers came into the house Appellant was standing at the dresser

going through a black bookbag and when Josh Gilchrist came back and "screamed" that it was the police, Appellant threw the bag into the closet and laid on the ground. Kraft showed the police where the black bookbag was in the closet.

**{¶42}** When defense counsel was cross-examining Sergeant Porreca about Kasey Kraft's statement about the black bookbag and where it was located, Sergeant Porreca reiterates once again he did not know if the bag was Appellant's, all he knew was Appellant had been holding it right before the police entered the residence:

Q. Okay. But surely after Ms. Kraft's statement on that couch when she tells you Lamar [Appellant] put a bookbag in the closet you knew what you were looking for. Didn't a red light go off in your mind bookbag from before, bookbag now?

A. [Sergeant Porreca] No.

Q. Okay. But you knew you were looking for a bookbag.

A. I knew that Lamar had a bookbag that he put in the closet. That's what I knew.

Q. So, you knew you were looking for the bookbag and you knew it was Lamar's.

A. I knew there was a bookbag Lamar was holding. I did not know who owned the bookbag.

Q. But you had information – she told you he was looking in his bookbag. She tells you in the statement "Going through his bookbag, I don't know what for."

A. On the scene I'm not sure how she worded it. I know she – I know she said he was looking through a bookbag standing at the closet – or at the dresser and when Josh said it was Toronto police he took the bookbag and put it in the closet.

**{¶43}** In *Snype*, the court stated an open-end consent to search the premises extends to any items found in the apartment with the exception of those "obviously"

belonging to another person. *Snype* at 136. The above evidence does not establish the police had knowledge the bookbag obviously belonged to someone other than Lori Neal. Although Appellant may have been looking inside the bag that does not necessarily establish the bookbag was his. *See id.* (Police observed defendant carry the blue duffel bag into apartment. That observed fact was insufficient to prove the bag obviously and exclusively belonged to the defendant.). Although both officers admitted to arresting him previously with a bookbag, both acknowledged they did not know this black bookbag was his until it was opened. There was no testimony this bag had identifying marks which would lead the officers to know it was obviously his. Consequently, on the basis of *Snype* and *Melgar*, I would hold Lori Neal had apparent authority to consent to the search of the bookbag. The search was constitutionally sound.

{¶44} However, even if I am incorrect in my reliance on *Melgar* and *Snype*, the suppression ruling still should be affirmed. Appellant argues the facts of the case at hand are analogous to the facts of *United States v. Salinas-Cano*, 959 F.2d 861 (10th Cir.1992). In *Salinas-Cano,* the defendant left a suitcase at his girlfriend's apartment. After arresting him on a controlled buy, the police went to the girlfriend's apartment and obtained her permission to search the residence. The police told the girlfriend they were interested solely in Salinas-Cano and his possessions and the girlfriend led them to his possessions. An officer opened and searched Salinas-Cano's closed unlocked suitcase and discovered cocaine. Prior to the search of the suitcase, the girlfriend specifically told the police she was not the co-owner of the suitcase and that it belonged exclusively to Salinas-Cano. The Tenth Circuit held the search was objectively unreasonable because the officer was aware the girlfriend did not have common authority to consent to the search of the container and could not rely upon apparent authority because the girlfriend specifically identified the suitcase as Salinas-Cano's exclusive property.

{¶45} The case before us is not similar to *Salinas-Cano* because in *Salinas-Cano* the defendant was not aware a search was being conducted of the apartment.

Here, Appellant was aware of the search, and he had the opportunity to express his ownership of the bookbag prior to the search, but instead remained silent. Prior to the search, Lori Neal, in front of the police officers told Josh Gilchrist and Appellant that if there was anything in the house they need to get it out and she gave the officers oral permission to search the house. Gilchrist denied there was anything in the house, and Appellant remained silent. Gilchrist and Appellant were then taken to the cruisers and Lori Neal signed the Consent to Search form. The officers began searching after the form was completed.

{¶46} Since Appellant knew the house was going to be searched and Lori Neal had consented to the search, Appellant could have at that point claimed ownership of the black bookbag and indicated he did not consent to the search of it. However, he remained silent and did not claim ownership of the black bookbag.

{¶47} This fact pattern is somewhat similar to a fact pattern that was before the Fifth Appellate District. *State v. Jackson*, 5th Dist. No. 97CA0100, 1998 WL 172808. In that case, officers received complaints of drug activity at an apartment. Officers went to the apartment, identified themselves, and informed the occupants of the complaints. *Id.* Jeff Freeman, one of the occupants, told the police he was the tenant and gave consent for the officers to search the premise. *Id.* A box was found in the apartment and the occupants, including Jeff Freeman and Jackson were asked if the box was theirs. *Id.* Everyone denied ownership of the box. *Id.* Although Freeman denied ownership of the box, he gave the officers permission to open it. *Id.* Drugs and cash were found in the box. *Id.* The bedroom where the box was found was later identified as Jackson's bedroom. *Id.*

{¶48} On appeal, Jackson conceded Jeff Freeman possessed the apparent authority to consent to a search of the premises. *Id.* However, he argued once Jeff Freeman denied ownership of the container, Freeman did not have apparent authority to consent to the search of the container. *Id.* Jackson also asserted his own denial of ownership of the box did not negate his expectation of privacy in the box. *Id.*

**{¶49}** The appellate court found no merit with the arguments. *Id.* It held the trial court correctly found Jeff Freeman had sufficient apparent authority to consent to the officers opening the apparently abandoned box found in Freeman's apartment. *Id.* Furthermore, when none of the occupants claimed ownership of the box, a reasonable police officer would not believe opening the box violated any of those occupants privacy interest. *Id.*

**{¶50}** This reasoning could apply here. Appellant could have claimed ownership of the bookbag and retained his expectation of privacy. However, it appears Appellant choose to take the calculated risk of not claiming ownership and hoping the police would not find the bookbag in the closet. By remaining silent, Appellant effectively abandoned the property that was not "obviously and exclusively" his and as such, Lori Neal had the apparent authority to consent to the search of the bookbag.

**{¶51}** For those reasons, I would affirm the trial court's suppression ruling and find no merit with Appellant's third assignment of error. Likewise, I would also find no merit with Appellant's first, second, and fourth assignments of error claiming the state produced insufficient evidence to support the possession of drugs charge, the conviction for possession was against the manifest weight of the evidence, and trial counsel provided ineffective assistance of counsel. A review of the record indicates there is no merit with these assignments of error. Thus, I would affirm Appellant's conviction.